ROBERT E. PURCELL, Plaintiff and Respondent, *v.* JAMES GIBBS and HARRIETTE GIBBS, Husband and Wife, Defendants and Appellants, and CLARENCE CULVER and ARTHUR CULVER, Co-partners, Defendants.

No. 9716.

Submitted March 17, 1958. Decided June 12, 1958.

326 Pac. (2d) 679.

Paul W. Smith, J. Miller Smith and Chadwick H. Smith, Helena, J. Miller Smith, Helena, argued orally, for appellants.

Colgrove & Brown, Miles City, F. F. Haynes, Forsyth, James P. Lucas, Miles City, Toomey & Hughes, Helena, Franklin A. Lamb, Billings, Michael J. Hughes, Helena, argued orally, for respondent.

THE HON. JAMES T. SHEA, District Judge, sitting in place of MR. JUSTICE BOTTOMLY.

This is an appeal from a money judgment awarded plaintiff and respondent, Robert E. Purcell, against James Gibbs and Harriette Gibbs, husband and wife, defendants and appellants herein.

On March 27, 1953, Robert E. Purcell commenced the action at bar to recover from James and Harriette Gibbs the sum of $500 representing fees for a former action to quiet title to lands hereinafter described, $77.70 costs, less $50 previously paid and $1,600 for obtaining an oil and gas lease, making a total of $2,-127.70. By his complaint Mr. Purcell prayed that he be decreed to have a lien on the lands for such attorney fees, costs and interest and that the claim of The Culver Company, also a defendant in the instant action, by virtue of an oil and gas lease given to it by James and Harriette Gibbs, be decreed to be subject and inferior to such lien.

James and Harriette Gibbs filed an amended answer and cross complaint to Attorney Purcell's complaint. By it, the defendants, James and Harriette Gibbs, admitted Attorney Purcell was retained to quiet title to the lands involved, denied the title was quieted and denied they retained Mr. Purcell to obtain for them any oil or gas lease. They did admit they had advanced $50 to apply on costs and that they had not paid the attorney fees. As an affirmative defense they averred that Attorney Purcell failed, refused and neglected to name the Shell Oil Company as a defendant in the quiet title action; that by reason thereof the right, title, estate and interest of James Gibbs was not completely determined and adjudicated; and that an oil and gas lease previously given to the Shell Oil Company by Myrtle Cato Williamson, Mary Cato Swayne and George E. Swayne, husband of Mary, constituted a cloud upon the property. It was further averred that James and Harriette Gibbs did not agree to pay Attorney Purcell the sum of $2,100 or any other specified sum of money as an attorney fee for legal serv-

ices rendered; that they did agree to pay a resonable fee for quieting title to the lands involved, but that Attorney Purcell did not properly quiet title, did not completely determine and adjudicate the title to the lands, and by reason of such facts he was not entitled, and had not earned any sum or compensation whatever for his purported legal services.

A cross complaint against Attorney Purcell was included in the amended answer and therein, *inter alia,* Mr. and Mrs. Gibbs again averred that Attorney Purcell failed, refused or neglected to name the Shell Oil Company as a defendant in the quiet title action by virtue of the oil lease it had on the lands, as previously related. They further averred a certain stipulation dated February 27, 1953, was not authorized in advance nor subsequently ratified by Mr. and Mrs. Gibbs, or either of them, and that such was of no force or effect. They further averred that by reason of Attorney Purcell's failure, refusal or neglect to name the Shell Oil Company as a defendant in the quiet title action and the resulting cloud on the title to the lands, they had been damaged in the sum of $19,073, and prayed for judgment in this amount.

In due time further appropriate pleadings were filed so that the cause came to issue.

By the judgment and decree, the court held that the plaintiff, Robert E. Purcell, was not entitled to the lien he prayed for in his complaint, and as a result thereof the defendant, Culver Company, was eliminated from the suit and they are not now before this court for any purpose.

An examination of the pleadings and evidence, oral and documentary, and as shown by the transcript on appeal in the instant action, discloses the following facts, viz.: On October 6, 1936, James Gibbs acquired title from one Amy Hutchinson, formerly known as Amy McGregor, in and to lands situated in Garfield County, Montana, described as being the north half of Section 32, Township 16 north of Range 42 east Montana Meridian, Montana, containing 320 acres. Thereafter, taxes levied upon the property were not paid and became delinquent,

commencing with the second half of the 1937 taxes which amounted to $7.16. It further appears the property was sold to Garfield County, on July 19, 1938, for the sum of $7.30. Later, and on September 10, 1943, the county clerk of Garfield County gave notice of application for a tax deed upon the real property, therein setting forth the above facts and, in addition, setting forth that subsequent taxes against the real property, due and unpaid, together with interest and penalties, amounted to $95.49; that the total sum required to redeem the real property from sale (exclusive of certain interest or charges for posting and serving notice) amounted to $105.94; and further set forth if the property was not redeemed from sale prior to November 30, 1943, Garfield County would then apply to the county treasurer for a deed of conveyance. No redemption was made. Accordingly, and on December 1, 1943, a tax deed upon the property, in consideration of the sum of $105.94, was issued by the county treasurer to Garfield County. It is this deed which brought about the litigation herein referred to. It appears that Garfield County thereafter, and on April 3, 1946, sold the land on contract, presumedly to the parties hereinafter named, for thereafter and on April 4, 1951, Garfield County conveyed the land described to Myrtle Cato Williamson and Mary Cato Swayne, reserving unto itself 6¼ per cent royalty interest in all oil, gas and other minerals recovered and saved from the land. Following this acquisition of title to the land, Myrtle Cato Williamson and Mary Cato Swayne, together with George E. Swayne, on July 18, 1951, executed an oil and gas lease upon the lands in favor of the Shell Oil Company, a corporation. Such was the situation and condition of title on September 15, 1952, when the plaintiff, Robert E. Purcell, was retained by the defendants, James and Harriette Gibbs, to commence proceedings to quiet title to the lands in question.

On September 19, 1952, pursuant to the aforesaid authorization, an action to quiet title to the lands in question was instituted by Attorney Purcell and therein James Gibbs was named plaintiff and Myrtle Cato Williamson and Mary Cato Swayne,

Garfield County, a body politic and corporate, and "unknown persons" were named as defendants. In due time it was ascertained that Myrtle Cato Williamson had passed away. Accordingly, an amended complaint was filed on October 2, 1952, and therein Mary Cato Swayne, Mary Cato Swayne, as executrix of the estate of Myrtle Cato Williamson, deceased, Mary Cato Swayne, individually and as heir and devisee under the last will and testament of Myrtle Cato Williamson, deceased, were made defendants. Other than for this change in names the defendants were the same as named in the original complaint. The original complaint did not name the Shell Oil Company, a corporation, as a party defendant. To this amended complaint, separate general demurrers were interposed on behalf of the defendants, Garfield County, a body politic and corporate, and Mary Cato Swayne, individually and as executrix of the estate of Myrtle Cato Williamson, deceased. The demurrers, in due time, were overruled. By stipulation, additional time was granted the last-named defendants to answer. Later, and on February 17, 1953, a stipulation was entered into between counsel for plaintiff and the defendants last named; it was filed in said cause on February 18, 1953, and is in the following words and figures, to-wit:

"It Is Hereby Stipulated and Agreed by and between the Attorney for the Plaintiff in the above entitled action, and the attorney for the defendants Mary Cato Swayne; Mary Cato Swayne, as Executrix of the Estate of Myrtle Cato Williamson, deceased; Mary Cato Swayne, individually, and as heir and devisee under the Last Will and Testament of Myrtle Cato Williamson, deceased, as follows:

"1. That the stipulation heretofore entered into between the attorneys for the above named parties granting to said defendants until February 28, 1953, in which to serve and file an answer to the amended complaint therein, shall be, and is hereby withdrawn. That these defendants refuse to plead further and consent that the default of the defendants Mary Cato Swayne; Mary Cato Swayne, as Executrix of the Last Will and Testa-

ment of Myrtle Cato Williamson, deceased, shall be entered; and consent to the entry of judgment by the court against the defendants quieting title in the Plaintiff to the lands described in the complaint.

"2. That upon entry of judgment against the above named defendants quieting title to said land in the Plaintiff, that the Plaintiff, together with his wife, Harriett Gibbs, will convey to Mary Cato Swayne the surface rights to the land described in the complaint, reserving to said Plaintiff, his heirs and assigns, all minerals, including oil and gas, in and under the land described in the complaint, to-wit: N½ of Section 32, Township 16 North, Range 42 East, M.P.M., containing 320 acres, more or less, together with right of ingress and egress upon said land at all times for the purpose of siesmographing, prospecting, exploring, mining and drilling for oil, gas and other minerals and removing same therefrom, and any and all rights and privileges necessary, incident thereto, or convenient for the economical operation of said land for such purpose.

"3. That the defendants herein waive all right to a refund or repayment of the money paid by said defendants for the purchase of the above described land in Garfield County, and all taxes thereafter paid by said defendants, or either of them, to Garfield County on said land, together with all penalty and interest; and agree that so much of that certain oil and gas lease heretofore entered into with the Shell Oil Company by the defendants affecting the land described in the complaint, shall be cancelled of record; and that the Plaintiff hereby waives and relinquishes all right to recover from the defendants the sum or sums of money heretofore paid said defendants by the Shell Oil Company under said lease. That plaintiffs agree to pay Garfield County any moneys due for delinquent taxes."

On February 18, 1953, the defendant, Garfield County, filed its separate answer to the amended complaint; therein admitted it was a body politic and corporate; generally denied all other allegations contained in the amended complaint; averred defendant county claimed an interest in the lands adverse to plain-

tiff; that such interest consisted of a 6¼ per cent royalty interest of all oil, gas and other minerals recovered and saved from such lands; denied its claim was invalid or void and alleged its claim was a good, valid and legal claim and lien upon said lands. An appropriate reply was filed to this answer on February 19, 1953. By it plaintiff, James Gibbs, offered to pay to Garfield County all delinquent taxes, penalty and interest due.

Later, and on February 20, 1953, counsel for James Gibbs and counsel for defendant county, entered into the following stipulation, viz.:

"It Is Hereby Stipulated and agreed by and between plaintiff's attorney, Robert E. Purcell, Esq., and the County Attorney of Garfield County, Manuel J. Roth, Esq., the attorney for the said defendant Garfield County, that the plaintiff will reimburse the said Garfield County for the delinquent taxes, penalties and interest due and owing said county for the years 1944, 1945 and 1946 and amounting in the sum of Fifty Nine and 48/100 ......... ($59.48) ......... Dollars at the time the plaintiff receives the decree quieting title to the lands in this action.

"It Is Further Stipulated that the plaintiff herein will bear and pay the costs incurred by him in this action.

"It Is Further Stipulated that the defendant Garfield County on the motion of the County Attorney for said county will withdraw its Demurrer and Answer, heretofore filed in said action, refusing to further plead and thereby consenting to an entry of a decree quieting title in the name of the plaintiff to the lands in this action."

Summons by publication was had on all unknown defendants. Thereafter their default was ordered entered, and pursuant to the stipulations aforesaid, the cause came on for hearing before the court on February 21, 1953, at which time the court made and entered its judgment and decree absolutely and unequivocally quieting title to the lands in the plaintiff, James Gibbs, further decreeing therein he was to pay the costs incurred by him in the action, and in addition he was to pay Garfield County

the delinquent taxes, penalty and interest due and owing for the years 1944, 1945 and 1946, amounting to the sum of $59.48.

No appeal was ever perfected from this judgment and decree.

In accordance with the stipulation last referred to, and when the decree quieting title to the lands was given and made, and pursuant to the provisions thereof, Harriette Gibbs, wife of James Gibbs, paid the taxes for the years 1944, 1945 and 1946 which, with penalty and interest, amounted to $59.48. Had it not been for the two stipulations referred to, James Gibbs would have been liable for all taxes, penalties and interest, levied and assessed against the lands commencing with the second half of the 1937 taxes, up to and including February 21, 1953, when the decree quieting title to the lands was given and made, or for a period of over fifteen years. In other words, James Gibbs, in addition to the 1944, 1945 and 1946 taxes so paid as aforesaid, was liable for all other taxes, with penalties and interest, that were paid by Myrtle Cato Williamson and Mary Cato Swayne, or either of them, or which were due Garfield County.

It is evident to this court, and supported by an abundance of evidence offered and received at the trial of the instant action, that the motivating consideration for the stipulations referred to in this opinion was the saving to James Gibbs, in the quiet title action, of all the tax money, penalty and interest which he otherwise would have had to pay were the stipulations not entered into, and that he was primarily interested in the oil rights in and under said lands, and not the surface rights.

A letter from James and Harriette Gibbs (signed J. S. Gibbs and Mrs. J. S. Gibbs) dated September 15, 1952, and which authorized Attorney Robert E. Purcell to institute the quiet title action, *inter alia*, had this to say: ''And let us know if it can be leased to oil companies, and if you will handle it for us?''

Pursuant to said letter, Robert E. Purcell, as early as or prior to October 28, 1952, commenced activities toward obtaining an oil and gas lease on the property. On October 28, 1952, by letter addressed to Mr. and Mrs. James Gibbs, he advised them of a call he had from the Shell Oil Company about a lease. He

further advised them that after he had had a talk with the Shell Oil Company, he would write them. On October 31, 1952, he again sent a letter to Mr. and Mrs. James Gibbs and advised them of an offer made by the Shell Oil Company of $10 per acre for a lease and further stated that he had advised the Shell Oil Company that if they would make what he, Purcell, considered a fair offer, such would be recommended to Mr. and Mrs. Gibbs. On November 3, 1952, Harriette Gibbs answered and, *inter alia*, stated: "Whenever you feel you have the lease up to your standard of the right price you can get us by phone at 3-1324 here in Medford." Other correspondence was had between the parties relative to oil leases, showing therein that Attorney Purcell was doing his utmost to obtain an advantageous oil and gas lease for Mr. and Mrs. Gibbs. As late as February 4, 1953, Mr. Purcell advised Mr. and Mrs. James Gibbs by letter he had been offered as high as $20 an acre for an oil and gas lease. At the same time he had advised Mr. and Mrs. Gibbs, if the quiet title action was proceeded with, and won, then Mr. and Mrs. Gibbs would have to pay the amount of money Myrtle Cato Williamson and Mary Cato Swayne had paid for the land when they obtained title to it from Garfield County, and in addition the taxes paid subsequent thereto and the taxes due at the time the county took a tax deed, all amounting to some $500 or $600. Mr. Purcell then offered to advance and pay these taxes for Mr. and Mrs. Gibbs.

On October 19, 1953, Harriette Gibbs appeared in Jordan, Montana. At or about that time Mr. Purcell succeeded in obtaining an offer of $25 per acre from the Shell Oil Company for an oil and gas lease, or $5 more per acre than any previous offer. This was satisfactory to Mrs. Gibbs and she executed the lease. At the same time the Oil Company made out its draft for $8,000 payable to James Gibbs and Harriette Gibbs, receipt for which was signed by Mrs. Gibbs and then left the draft with Mr. Purcell to be delivered to Mr. and Mrs. Gibbs upon the lease being signed by Mr. Gibbs. After the lease was signed and acknowledged by Mrs. Gibbs, and on February 19, 1953, Mr. Purcell

forwarded it to Mr. Gibbs for his signature. It was accompanied by a letter of instructions signed by Mr. Purcell. On February 21, 1953, Mr. Purcell, Mrs. Gibbs and the county attorney of Garfield County, drove to Miles City, Montana, appeared in court, presented proof and then obtained the decree quieting title to the land in the name of James Gibbs as previously related. Mr. Gibbs made no personal appearance at the trial. For his services in the premises, Mr. Purcell charged the several amounts set forth in his complaint in the case at bar. Mrs. Gibbs was personally advised of the fees charged while she was still in Jordan, and Mr. Gibbs was advised thereof by letter. All were satisfactory to Mrs. Gibbs, she having been informed at the time by Mr. Purcell that when he received the extra $5 per acre for the lease offer, he in effect then and there earned his $1,600 fee for obtaining the lease. Shortly after this time, Mrs. Gibbs appeared at the office of the Shell Oil Company in Billings, Montana, and there tried to obtain a new draft for the $8,000 draft previously left in the care of Attorney Purcell. The Shell Oil Company declined to issue another draft until they had received the fully executed lease and because they already had one draft outstanding. At this time Mrs. Gibbs was further advised by the Shell Oil Company officials that as soon as the lease was signed they would be very happy to issue a new draft and cancel the first draft if she should have any trouble with Mr. Purcell not delivering the draft which he had. About this time Mrs. Gibbs left for her home in Medford, Oregon. A deed also had been forwarded to Mr. and Mrs. Gibbs for their signature conveying the surface rights of the land to Mary Cato Swayne pursuant to the stipulation previously entered into concerning that phase of the quiet title action. Mr. and Mrs. Gibbs did not, nor did either of them, ever return to Mr. Purcell the Shell Oil Company oil and gas lease or the deed conveying the surface rights to the land.

On March 9, 1953, Mrs. Gibbs forwarded a letter to Mr. Purcell therein telling Mr. Purcell he had a $500 check deposited in a Medford bank and advising that as soon as certain papers

and documents were sent to her, the check would be released. This was followed by a telegram sent by Mrs. Gibbs on March 11, 1953, to Mr. Purcell, advising him his services had been terminated and that a $500 check was at the U. S. National Bank in Medford. Neither of these documents were signed by Mr. Gibbs.

Later, and on March 12, 1953, Victor T. Vestman, who had been employed by the Shell Oil Company, called upon Mr. and Mrs. Gibbs in Medford, Oregon, for the purpose of obtaining the deed to the surface rights and the executed oil lease. Apparently, Mr. Vestman talked to each separately. It was evident he could not get both together at the same time. In any event, Mrs. Gibbs wanted $8,000 in cash for the lease with a rider attached to the effect that Mr. and Mrs. Gibbs would be saved harmless in the event there was ever a failure of title. Mr. Vestman was unable to obtain the deed or lease.

Still later, Mr. Vestman learned an oil and gas lease to The Culver Company had been placed of record. This lease, plaintiff's Exhibit FF in the case at bar, was dated and acknowledged on March 11, 1953. Concerning this lease, at the trial of the case, both Mr. and Mrs. Gibbs testified it was signed on March 13, 1953, and that they had been paid $8,000 in cash for it. The only logical inference to be drawn from the foregoing is that when Mr. Vestman appeared at Medford, Oregon, on March 12, 1953, to obtain the Shell Oil Company oil and gas lease, he could not obtain it because Mr. and Mrs. Gibbs had already leased the land the day before to The Culver Company. Another fair inference to be drawn was that Mrs. Gibbs would have accepted $8,000 in cash from the Shell Oil Company in addition to the $8,000 cash paid them by The Culver Company for its lease provided a rider was attached to the lease saving Mr. and Mrs. Gibbs harmless in the event of a failure of title.

In order to shed more light on the instant case, it is interesting to note that on August 29, 1952, Mrs. James Gibbs forwarded a letter to an unnamed person, it being merely addressed to "Attorney, Jordan, Montana." This letter came

into the hands of Attorney Roth, who in turn delivered it to Attorney Robert E. Purcell. Under date of September 5, 1952, Mr. Purcell answered this letter and therein stated he had looked up the title to the land in question and also that he presumed her husband had died. This letter was answered by both Mr. and Mrs. Gibbs on September 15, 1952. This was the letter previously referred to herein and which authorized Mr. Purcell to institute the aforesaid quiet title action. Thereafter, all other letters forwarded by Attorney Purcell, and there were at least eleven, were addressed to "Mr. and Mrs. James Gibbs," at their Medford, Oregon, address. According to Mrs. Gibbs, Mr. Gibbs read all of these letters. She testified:

"Q. If you will, will you count the ones that are addressed to Mr. & Mrs. James Gibbs?

"Mr. Paul Smith: It has no bearing on the case.

"The Court: Sustain the objection to this. Did you read those letters that are addressed to you and Mr. Gibbs?

"The Witness: Yes, I had.

"The Court: And Jim [meaning James Gibbs] had read them too?

"The Witness: Yes, he had.

"The Court: All right."

Later, a few letters were addressed to Mr. Gibbs personally while Mrs. Gibbs was in Jordan, Montana. Not once did Mr. Gibbs answer any letter whatsoever other than to sign the one letter of September 15, 1952. All of the letters forwarded by Attorney Purcell to "Mr. and Mrs. James Gibbs" fully informed them of the progress of the quiet title action and what they would have to do in connection with unpaid taxes and Mr. Purcell's work toward obtaining for them a favorable oil and gas lease. All were answered by Mrs. Gibbs and in practically all of her letters to Mr. Purcell she was effusive in praising him for what he was doing on their behalf. Mr. Gibbs sat idly by without objecting in any way to that which Attorney Purcell was doing in the premises. At no time did he forbid, prohibit or take any steps whatsoever to prevent Purcell from

doing the things he was doing on behalf of both Mr. and Mrs. Gibbs.

A part of the aforesaid alleged damages of $19,073 set forth in said cross complaint, included a claim of loss of profits in losing a sale of one-half of the minerals during June of 1953 in the amount of $11,200, and it will be noted this claim of loss of profits was after Mr. and Mrs. Gibbs leased the lands to The Culver Company. It is further apparent some additional action had been instituted to remove as a cloud on the title the aforesaid Shell Oil Company oil and gas lease executed by Myrtle Cato Williamson and the Swaynes.

Thereafter, and on October 17, 1955, the case came on for trial before the court and a jury sitting in an advisory capacity, the cause being in equity and so treated by all persons to the suit. At the beginning of the trial, respective counsel for the parties to the action commenced the reading of the pleadings to the jury. After the complaint was read by counsel for Mr. Purcell, the amended answer of the defendants, Mr. and Mrs. Gibbs, was read by their counsel and as such counsel was about to read the affirmative defense and cross complaint contained in the amended answer, objection to such reading was made by counsel for Mr. Purcell. This objection, tersely stated, was that in view of admissions made in the pleadings of the defendant, Mr. and Mrs. Gibbs, to the effect that the tax deed issued to Garfield County was null and void and that Mary Cato Williamson, Mary Cato Swayne and George E. Swayne, on July 19, 1951, or at any other time, or at all, ever owned or had any interest in the lands, the pleadings referred to did not state any defense and were immaterial under the provisions of section 17-1002, R.C.M. 1947. Argument on the objection was had before the court and during the argument and for the purpose of making a record in the case, counsel for Mr. and Mrs. Gibbs again admitted the tax deed to Garfield County was void and further admitted that the parties who gave the oil and gas lease to the Shell Oil Company (Myrtle Cato Williamson, Mary Cato Swayne and George E. Swayne) ''never at any time had any

interest in the property—never owned it at any time and that Garfield County never got any title and did not have any right to convey the property to the Williamsons and Swaynes,'' whereupon the court sustained the objection and in so doing held that the lease of the Shell Oil Company was not a cloud upon the title.

In the instant action, both Mr. and Mrs. Gibbs were witnesses on their own behalf and in addition Mrs. Gibbs was called as a witness by the plaintiff, Mr. Purcell, under the provisions of section 93-1901-9, R.C.M. 1947. Briefly and succinctly stated, and as near as it can be gathered from all of her testimony, it was to the effect that when she appeared at Jordan, Montana, and signed the Shell Oil Company oil and gas lease and appeared in court at Miles City as a witness for her husband in the quiet title action, she was merely there for the purpose of ascertaining what was going on so that she could report to her husband as she had no authority to do or say anything contrary to his wishes or instructions. In other words, she was only there to see about things for her husband's approval. In the course of Mr. Gibbs' testimony he testified as follows:

''Q. If I understood you correctly, you have never once in this whole bunch of letters and exhibits that have gone in here ever written to Bob Purcell? A. I never have, no sir.

''Q. So that everything that was done you left up to your wife? A. No absolutely, no. We talked it over.

''Q. You left it up to your wife? A. No.

''Q. Did you ever advise by letter or otherwise Mr. Purcell that your wife's authority to handle this transaction was in any respect limited? A. No, sir, I didn't.

''Q. The only time that you wrote to Mr. Purcell or ever signed anything was this letter Plaintiff's Exhibit 'C' is that correct? A. I think that is the only one, yes.

\*    \*    \*    \*    \*    \*

''Q. And that immediately follows this statement here, does it not? 'So please start whatever action it needs to regain the land and let us know if it can be leased to oil companies, and

if you will handle it for us? Sincerely J. S. Gibbs' that is your signature, is that right? A. That's right. That is merely a question.

"Q. Now, all these other letters, and I wish you would count them, are addressed to you by Mr. Purcell?

"The Court: I don't think we are going to take up the time doing that.

"Q. In any event, are there any letters there that are addressed only to your wife? A. I don't think so, I don't know.

"Q. So that all letters that Mr. Purcell addressed except possibly one were addressed to either you personally or to both you and your wife? A. I imagine so. I didn't look them over.

"Q. And at no time up to the present time, right here in this courtroom, did you ever advise Mr. Purcell that your wife's authority was limited, is that right? A. Well, we told him that the only thing for him to do was to clear the title to that land.

\*     \*     \*     \*     \*     \*

"Q. The only time Mr. Purcell ever heard you state that your wife's authority was limited with respect to the handling of this land was right here today in this courtroom from that witness stand, isn't that right? A. I suppose that is the only time he heard it voiced, I don't know.

"Q. But yet you tell us today that when your wife came here she had no authority to even go into court for you, is that correct? A. That's correct, yes.

"Q. She had authority to even sign the leases, is that correct? A. That's correct.

"Q. She had no authority to even sign the draft, is that correct? A. That's correct.

"Q. And as a matter of fact, she had no authority to even go into court and have the judgment entered? A. Right.

"Q. And yet none of those things that you said she did not have the authority to do did you ever communicate to Mr. Purcell? A. I never talked to Mr. Purcell.

"Q. Did you understand that in order for you to get the

land back you would have to pay back all the taxes that had been paid by the Swaynes to the Williamsons? A. I wasn't there at the hearing. I told you he didn't notify me.

"Q. Didn't the first letter tell you that before your wife even came? A. Yes, he mentioned that.

"Q. Now, so that you knew all about that when she came? A. I knew the first part of it, yes.

"Q. Did you not know at the time your wife came here that it had been proposed or suggested or talked about in Mr. Purcell's letter the possibility of the Williamsons taking the surface and you taking the minerals? A. I heard it mentioned, yes.

"Q. Well, now, did you hear it or read it in a letter? A. I just heard it. I didn't read it in a letter.

"Q. Now, this letter that prompted your wife to come here, did you read that letter? A. Sure I read it.

"Q. Wasn't it suggested in there that it probably might be worked out by Williamsons taking—or Swaynes taking the surface and your wife taking the minerals? A. No.

"Q. It wasn't in that letter? A. Sure it was in it.

"Q. So that you knew that that proposition had been proposed at the time your wife came up here? A. Absolutely.

"Q. And you also knew, as Mr. Purcell advised you, to get the land back you would have to pay back all the back taxes, isn't that right? A. I think he said something like that.

"Q. And you also knew, and this is the first time you heard anything about it, that you were going to get $20.00 an acre or that amount had been proposed, is that right? A. I didn't understand the question.

"Q. Was it not the letter of February 4th wherein the sum of $20.00 an acre was offered for the land? A. I think so in that letter.

"Q. And it was mentioned in that letter that the lease would be for 10 years, wasn't it? A. Yes, sir.

"Q. At that time of course you only wanted one for five, is that correct? A. That's correct.

"Q. You knew the purported lessee was the Shell Oil Company, isn't that right? A. Yes, sir.

"Q. And you knew at that time that in order to get the land and all of the minerals it would be necessary to quiet out Garfield County, is that correct? A. Yes, sir.

"Q. And the result of which would have been to cut out the counties six and a fourth minerals, you knew that too? A. Yes, sir.

"Q. And didn't Mr. Purcell advise you at that time that he would continue to get the land back without making any deal at all if you wanted it done that way? A. That is what he said, yes.

"Q. Yet knowing all of those things, knowing all of that transaction, knowing all of the facts that were brought to your attention, you never wrote a letter to Mr. Purcell, is that correct? A. Yes.

"Q. You never called him on the telephone? A. No, sir.

"Q. But all you did was send your wife up here and didn't even give her a power of attorney or any letter to show the limitation on her authority? A. I never did.

＊ ＊ ＊ ＊ ＊ ＊

"Q. You haven't to this day reimbursed the Swaynes or Williamsons for all the back taxes, is that right? A. Part of the back taxes.

"Q. How much did you pay? A. $59.00 and something.

"Q. Didn't Mr. Purcell's letter say they would be around $600.00? A. There couldn't be $600.00 on them. You know that yourself.

"Q. When was it you were last in possession of that land? A. '43 I think.

"Q. And do you know what the taxes were up to the time that Mr. Purcell got it back for you in '53? A. No, I don't know exactly, no.

"Q. You haven't paid them, have you? A. Yes, we did. We paid some of the back taxes.

"Q. You paid $59.00, is that correct? A. Yes, sir.

"Q. And that was paid to the county, isn't that correct?
A. That's right.

"Q. But any of the money the Williamsons paid you haven't paid at all? A. They never asked for it.

"Q. Do you still now claim the surface to that land? A. Absolutely I claim it."

A great deal more might be said concerning the pleadings and evidence in the case at bar, including the testimony of both James and Harriette Gibbs. To do so would unduly lengthen this opinion. We did deem it necessary to set forth to some extent the facts in this cause for a more clear picture and understanding of all the issues. Here it is evident from the testimony of both Mr. and Mrs. Gibbs that they contend Mrs. Gibbs had no authority to do anything whatsoever in the premises, though it is self-evident she attended to all of the business without Mr. Gibbs (who had full knowledge of all that was going on), forbidding, prohibiting or protesting in any way. Taken by its four corners, the testimony of Mr. and Mrs. Gibbs offered in the case at bar was not only contradictory but it is difficult to understand how the same could be believed.

At the conclusion of the cause the court submitted to the jury three special interrogatories, the first being whether Harriette Gibbs was authorized, expressly or impliedly, to represent her husband; the second, the amount of compensation agreed on; and the third, did the plaintiff perform his part of the agreement. The jury found for plaintiff in each instance, and fixed the agreed compensation at $2,116.45.

By its judgment and decree in the case at bar, the court adopted the special interrogatories and answers thereto as its findings of fact, and in addition made further additional findings of fact, drew certain conclusions of law and then made and entered the judgment and decree previously referred to herein.

The appellants herein, James and Harriette Gibbs, have set up in their brief on appeal some thirty-three specifications of error. We deem all to be without merit.

Complex as the facts may seem to be, a solution of the issues in the case at bar is not difficult.

Here, the first paramount questions involved are: Was Harriette Gibbs the agent of James Gibbs? If so was James Gibbs bound by all that his wife, Harriette Gibbs, had done immediately before, during and immediately following the quiet title action?

The answers to these questions are found in the Montana statutes on agency, being sections 2-101 to 2-127, R.C.M. 1947, and certain Montana statutes pertaining to maxims of jurisprudence. These maxims of jurisprudence will be found in Title 49, R.C.M. 1947, which includes sections 49-101 to 49-135.

Under all of the testimony and evidence received in the case ■ at bar, and the law applicable to agency, we hold that if Harriette Gibbs was not an actual agent of James Gibbs, she was at least an ostensible agent for him, as a result of which James Gibbs was bound by her acts.

We further hold that the execution of the two stipulations ■ referred to in this opinion, the obtaining of the oil and gas lease previously referred to herein, and the obtaining of the decree in the quiet title action was one single indivisible transaction. The stipulation entered into between Mary Cato Swayne; Mary Cato Swayne, as executrix of the estate of Myrtle Cato Williamson, Deceased; Mary Cato Swayne individually and as heir and devisee under the last will and testament of Mary Cato Williamson, Deceased, and James Gibbs, in the quiet title action, provided that James Gibbs was to pay Garfield County any moneys due for delinquent taxes. The subsequent stipulation made between James Gibbs and Garfield County in the quiet title action further provided that James Gibbs was to pay the delinquent taxes due Garfield County for the years 1944, 1945 and 1946, amounting to the sum of $59.48. Pursuant to these stipulations and as previously stated herein, Harriette Gibbs paid these taxes. James Gibbs ratified the payment of the taxes, and by his testimony in the case at bar, heretofore quoted at some length herein, he justified his position in the premises by

the payment of such taxes and claimed the benefit thereof. No further ratification was necessary. Under the provisions of section 2-106, R.C.M. 1947, an agency was thus created, and under the provisions of section 2-118, R.C.M. 1947, wherein it is provided that a ratification of part of an indivisible transaction is a ratification of the whole, we hold that James Gibbs ratified the entire indivisible transaction involving the two stipulations and the decree in the quiet title action by claiming the benefits of the tax payment aforesaid. As was pointed out by Mr. Chief Justice Callaway in United States National Bank of Red Lodge v. Chappell, 71 Mont. 553, 568, 230 Pac. 1084, 1088, the court said:

"There cannot be any question that the making of the promissory note, the transfer of the stock, and the execution of the agreement were parts of one transaction. The statute says that several contracts, relating to the same matter, and made as parts of substantially one transaction, are to be taken together. Section 7533, Rev. Codes 1921 [now R.C.M. 1947, section 13-708]. And see Talbott v. Heinze, 25 Mont. 4, 63 Pac. 624; Cornish v. Woolverton, 32 Mont. 456, 81 Pac. 4, 108 Am. St. Rep. 598; Bartels v. Davis, 34 Mont. 285, 85 Pac. 1027; Dodd v. Vucovich, 38 Mont. 188, 99 Pac. 296, and Spotton v. Dyer, 42 Cal. App. 585, 184 Pac. 23; 8 C.J. 196, 197, and, as the parts of this transaction are to be taken together, they must be considered together for all purposes. Union Bank & Trust Co. v. Himmelbauer, 56 Mont. 82, 181 Pac. 332. So to all intents and purposes they are indivisible in this case. This transaction was the fruit of the doings of plaintiff's agent Romersa. But plaintiff insists that he was without authority to release the obligation upon which Roy Chappell was bound; that Romersa did not have the authority to receive anything but money for the forged notes indorsed by Chappell (First State Bank of Hilger v. Lang, supra [55 Mont. 146, 174 Pac. 597, 9 A.L.R. 1139]); that Romersa did not have any authority to execute the written agreement; and it insists that it did not ratify his action in so doing;

anyhow it insists that it did not ratify his act as to the written agreement.

" '* * * The statute declares 'ratification of part of an indivisible transaction is a ratification of the whole.' Sec. 7941, Rev. Codes 1921 [now R.C.M. 1947, section 2-118]. Now the plaintiff must either ratify this transaction in whole or reject it in whole. It must take the bad with the good; it will not be permitted to blow both hot and cold. As under the Scots law, it will not be permitted at the same time to approbate and reprobate. If plaintiff intends to retain the advantageous part of this indivisible contract, it will be compelled to maintain the disadvantageous part of it. Hence the apt question: 'Where did Romersa's authority start and where did it stop?' If he had authority to collect money only for the forged notes, then he did not have authority to accept the realty stock. If he did have authority to accept the realty stock, and the bank intends to be bound by what he did in that respect, then it must be held that he had authority to execute the agreement whereby he got it.

" 'Where a principal accepts a contract made by the agent, he takes it as the agent made it and subject to all equities and defenses arising out of the conditions thereof, and the means and instrumentalities by which the agent procured it, even though the agent acted without authority or in excess of his powers.' 2 C.J. 873; Davis v. Danforth, 65 Iowa 601, 22 N.W. 889.' '

This principle of law was again affirmed by this court in New Home Sewing Mach. Co. v. Songer, 91 Mont. 127, 7 Pac. (2d) 238. See also Arnold v. Genzberger, 96 Mont. 358, 31 Pac. (2d) 296.

Further, an application of the maxims of jurisprudence hereinbefore referred to, to the facts in the case at bar, should suffice to demonstrate that the defendants, James Gibbs and Harriette Gibbs, are not entitled to the relief they deem themselves entitled. Federal Land Bank of Spokane v. Gallatin County, 84 Mont. 98, 274 Pac. 288.

With reference to a failure on the part of Harriette Gibbs

to sign a deed to the surface rights of the land involved in the quiet title action pursuant to the first of the stipulations entered into, and previously referred to herein, she at various times in her testimony in the case at bar claimed and averred she had no land and therefore could convey none. She testified:

"Q. And so of course you were never going to make any kind of a deed at any time so far as your knowledge is concerned and were never going to make any kind of a deed to the Williamsons or the Swaynes? A. I couldn't. I had no land.

"Q. Now, you never were and you never understood it that way, either you or your husband would have to do that? A. I don't answer for my husband, Mr. Colgrove.

"Q. So that at no time as I get it did you ever have any understanding that you were going to deed anything to the Swaynes?

\* \* \* \* \* \*

"A. I would like it more clearly. What could I deed when I don't have it. I can only say that I agree with my husband what he wants to give away of his. I have no land out there.

\* \* \* \* \* \*

"Q. Did you advise Mr. Vestman that you would not go through with the stipulation to deed the surface to the Williamsons? A. I couldn't answer yes or no to that.

"Q. I am not asking you to answer yes or no. Did you advise Mr. Vestman that you would not assure him that you would deed the surface by quitclaim deed to the Williamsons or the Swaynes, either one? A. Yes, sir, because I had no surface to deed."

Here it is evident that Harriette Gibbs overlooked her dower rights in and to the real property involved in the quiet title action. The law with reference to dower, in Montana, is set forth in sections 22-101 to 22-117, R.C.M. 1947, and by virtue of these statutes Harriette Gibbs had an inchoate right of dower in and to the lands involved, and it was for this reason her signature was required on the oil and gas lease obtained by the plaintiff, Mr. Purcell (and which she executed), and why

it was imperative that her signature be obtained to the deed conveying the surface rights to the land pursuant to the first of the stipulations herein referred to.

It is wholly immaterial that James and Harriette Gibbs obtained an oil and gas lease on the premises without the aid of Attorney Purcell, and it is wholly immaterial that James Gibbs refused to sign the oil and gas lease which was previously obtained by Purcell and which Harriette Gibbs did execute. The material fact is that Attorney Purcell did perform a service in the quiet title action and did perform a service in obtaining an oil and gas lease. For these services Attorney Purcell was entitled to compensation, for, ''The laborer is worthy of his hire.''

In the case at bar James and Harriette Gibbs retained for their own benefit all of the rights and privileges obtained for them in the quiet title action which had been instituted by Attorney Purcell. Were it not for the decree rendered in that action, neither of them would have had an opportunity of taking advantage of the oil and gas lease obtained for them by Attorney Purcell nor would they have had the right to take advantage of the oil and gas lease which they later executed in favor of The Culver Company.

The final question involved in the case at bar is the claim of James and Harriette Gibbs that the oil and gas lease executed by Myrtle Cato Williamson, Mary Cato Swayne and George E. Swayne to the Shell Oil Company constituted a cloud on the title for the reason the Shell Oil Company was not named as a party defendant in the quiet title action. They further aver and strenuously assert the failure to name the Shell Oil Company as a party defendant cast a cloud upon the property and Attorney Purcell was not entitled to any compensation whatsoever by reason thereof. With this contention we do not agree. Followed in chronological order and as hereinbefore related, we first find that Garfield County obtained a tax deed and then conveyed the property to Myrtle Cato Williamson and Mary Cato Swayne and that then the last two persons, together with George E. Swayne, executed the oil and gas lease referred to.

Were it not for the fact Garfield County obtained a tax deed it would have been wholly unable to convey any title to Myrtle Cato Williamson and Mary Cato Swayne, and were it not for the fact that these two last-named persons obtained a deed of conveyance from Garfield County, they in turn would have been wholly unable to execute the oil and gas lease referred to. The sole basis for the transfer of the land by Garfield County and the subsequent execution of the said oil and gas lease was the tax deed referred to. If the tax deed was void, and it was, then all subsequent transfers had thereunder were void and of no force and effect. The situation presented is akin to a house erected upon a foundation of quicksand. When the foundation was swept away, the house collapsed and nothing was left. So, here, when the tax deed was swept away the subsequent conveyance of said land by Garfield County and the subsequent oil and gas lease so based on said tax deed were likewise swept away. It might here be well to note that even if the Shell Oil Company had been made a party defendant in the quiet title suit, there was absolutely nothing it could do or would be able to do to revitalize and give life to a dead instrument, that is, to the void tax deed. It would be a mere idle act on the part of the Shell Oil Company to even appear in such an action under the circumstances here made to appear. "The law neither does nor requires idle acts." R.C.M. 1947, section 49-124.

We are further fortified in our position here enunciated by the provisions of section 17-1002, R.C.M. 1947, which provides:

"An instrument, the invalidity of which is apparent upon its face, or upon the face of another instrument which is necessary to the use of the former in evidence, is not to be deemed capable of causing injury, within the provisions of the last section."

We here hold that it was wholly unnecessary to name the Shell Oil Company as a party defendant in the quiet title action. All of the evidence in the instant case indicates this court is justified in reaching this conclusion. However, by all that is said in this regard, we feel that the instant case should not be a precedent to be adopted in the future, for the better

practice is, and as of right should be, to name as defendants all persons claiming an adverse interest in the property to the plaintiff.

In the instant cause we find no reversible error and the judgment appealed from is therefore affirmed.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICES CASTLES and ANGSTMAN, concur.

MR. JUSTICE ADAIR:

I concur in the result but not in all that is said in the foregoing opinion.